CITY NATIONAL BANK OF KANKAKEE, Trustee, *et al.*, Plaintiffs-Appellees, *v.* KENT SCHOTT *et al.*, Defendants-Appellants.

Third District   No. 82—333

Opinion filed March 16, 1983.—Rehearing denied April 25, 1983.

James C. Franczek, Jr., and Barbara J. Stob, both of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellants.

Edwin W. Sale, of Kankakee, for appellees.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiffs (petitioners), owners of a large tract of land, filed a petition with the Regional Board of School Trustees for the Kankakee County Service Region and the Board of Education of the Kankakee School District No. 111 for disconnection from the Kankakee School District No. 111 and annexation to Bradley Grade School District No. 61 and to Bradley-Bourbonnais High School District No. 307. The Board of Education of District No. 111 opposed the disconnection and requested a hearing. After the hearing, the hearing board denied the petition. The petitioners then appealed to the circuit court of Kankakee County, in the Twelfth Judicial District, for an administrative review. The circuit court held that the order of the hearing board was against the manifest weight of the evidence, reversed the order and ordered the requested disconnection and annexation. The defendant, School Board of District No. 111, appeals the decision of the circuit court and asks this court to determine whether the lower court correctly held that the hearing board's decision denying the petition for detachment was contrary to the manifest weight of the evidence. The nature of the issue compels this court to review the evidence, as well as applicable law, and judge the quality of the hearing board's findings. *Wirth v. Green* (1981), 96 Ill. App. 3d 89; *Board of*

*Education v. Regional Board of School Trustees* (1980), 85 Ill. App. 3d 394; *Virginia Community School District No. 64 v. County Board of School Trustees* (1963), 39 Ill. App. 2d 339.

The property in question consists of two tracts of land totaling 77 acres. The land sits on the northern boundary of the Kankakee School District No. 111. The Bradley-Bourbonnais High School District (BB) adjoins the tracts on the north and west. The Bradley Grade School District (BGS) adjoins the tracts only to the west. The land is within the corporate limits of the village of Bradley, and is an unspecified, but substantial, distance to the north of the city of Kankakee. Touching the northwest corner of the tracts is a subdivision called Quail Hollow, which is within BB and BGS districts. Quail Hollow was developed by one of the petitioners, Mr. Lovell. While the acreage is now vacant land, the petitioners (except Richard) proposed to develop and subdivide 30 acres of the western tract in which, it is anticipated, approximately 90 homes, costing from $60,000 to $75,000, will be sold for residences. (If, at some future date, Mr. Richard develops his half of the tract, then there could be between 160-210 homes in the area.) Water, gas and electricity are available, but the land has not yet been subdivided. As noted above, petitioners asked that the land be disconnected from the Kankakee School District.

The Illinois School Code, section 7—2.6, outlines what consequences must be considered by the hearing board when evaluating a petition for disconnection. The statute states, in relevant part, as follows:

> "*** The Hearing Board (a) shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto, and as to the ability of the districts affected to meet the standards of recognition as prescribed by the Superintendent of Public Instruction, (b) shall take into consideration the division of funds and assets which will result from any change of boundaries, and the will of the people of the area affected, and (c) shall determine whether it is to the best interests of the schools of the area and the educational welfare of the pupils should such change in boundaries be granted." Ill. Rev. Stat. 1979, ch. 122, par. 7—2.6.

Apart from the stipulations of the parties, the board made several findings of fact. From the evidence presented by the petitioners (which included maps and the testimony of several petitioners), the board concluded the petitioners based their request solely on financial and personal preference reasons, and Mr. Lovell's feasibility studies and investigations as to who would live in the proposed subdivision

were outdated and unsubstantiated. The board also noted there was no testimony from any person with children in the Kankakee School District and there were 10 students residing in a neighboring tract who attend the School District No. 111—these residents and students, who were not part of the petition, raised substantial negative inferences regarding the viability of the petitioners' claims that the potential residents of the subdevelopment would be primarily interested in having their children attend either the BB District or the BGS District.

From the evidence presented by the school district (which included attendance records and the testimony of the district superintendent Dr. Doglio), the board concluded the proximity of the various schools is not considerably different and busing would be needed; in the event the development did occur, the Kankakee School District would enjoy a substantial financial gain—or, if the petition were granted, a financial loss; and lastly, the disconnection would result in further segregation of the racial makeup of School District No. 111.

With these conclusions, the board found that it was not in the best interests of the schools of the area and the educational welfare of the pupils affected to allow the boundary changes requested by the petitioners. The board cited *Oakdale Community Consolidated School District No. I v. County Board of School Trustees* (1957), 12 Ill. 2d 190, for the rule that the welfare of the affected districts and their pupils as a whole must control rather than the wishes of a few, and such petitions should be granted only where the benefit derived by the annexing and affected areas clearly outweighs the detriment resulting to the losing district and the surrounding community as a whole. (12 Ill. 2d 190, 193-94.) Then, it held that the petitioners had fallen far short of establishing that the benefits of the proposed disconnection would offset the detriment to District No. 111. The board did not consider any standards other than the rule in *Oakdale.*

In the 25 years following the *Oakdale* decision, our appellate courts and supreme court have had several opportunities to review disconnection hearings, and have substantially built upon the *Oakdale* standard. (*Wirth v. Green* (1981), 96 Ill. App. 3d 89, 91.) Most recently, the supreme court, in *Board of Education v. Regional Board of School Trustees* (1982), 89 Ill. 2d 382, reviewed two factors which a board had considered in determining what were the best interests of the pupils in question. The board, in turn, had drawn these factors from various appellate court decisions. The court noted that it was not improper for the board to consider the "whole child" and "community of interest" factors. "The former factor recognizes that extracurricular participation in social, religious and even commercial activi-

ties is important in a child's development as a beneficial supplement to the child's academic involvement. (*School District No. 106 v. County Board of School Trustees* (1964), 48 Ill. App. 2d 158.)" (89 Ill. 2d 392, 397.) The latter factor is used to "ascertain whether the petitioning area is identified with the school district and the community to which annexation is requested. If a child attends school in his natural community it enhances not only his educational opportunity but encourages his participation in social and other extracurricular activities that figure importantly in the 'whole child' idea. The court in *Burnidge v. County Board of School Trustees* (1960), 25 Ill. App. 2d 503, 509-10, stated that more important than benefits of increased safety and savings in transportation costs and time 'is the fact that an identification with a school district in a child's natural community center will inevitably result in increased participation in school activities by the child and his parents. Such increased participation cannot but result in an improvement in the educational picture of the entire area.' " (89 Ill. 2d 392, 398.) The supreme court has not established any one of these guidelines as an absolute rule. But, the fact the high court considers them proper and many appellate courts have used these factors suggests that they should, at least, be evaluated during a hearing. In the instant case, the board totally failed to consider these factors. Furthermore, after reviewing the record, we believe that the board overlooked important evidence, and its findings as to financial loss and impending segregation were greatly exaggerated.

■ In order to avoid a lengthy point-by-point refutation of the board's findings, we shall summarize the evidence which the board chose to ignore. The appellants cite our supreme court in *Board of Education v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 397, for the principle that "[i]t is not for a court to reweigh evidence or substitute its judgment" for that of the hearing board. This is an important principle of administrative review. Nevertheless, the supreme court has also made clear, in *Oakdale Community Consolidated District No. 1 v. County Board of School Trustees* (1957), 12 Ill. 2d 190, 195, that the "rule which accords a *prima facie* validity to administrative decisions does not relieve a court of the important duty to examine the evidence in an impartial manner and to set aside an order which is unsupported in fact. It is unnecessary for this court to advert to the dangers inherent in a relaxation of this function. *** Our Administrative Review Act does not require judicial recognition of an order which is *against the manifest weight of the evidence,* 'nor does the law allow a stamp of approval to be placed on the findings of an administrative agency merely because such agency heard the wit-

nesses and made the requisite findings.' *Drezner v. Civil Service Com.* 398 Ill. 219, 231." (Emphasis added.) See *Board of Education v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 396.

■■ ■ It was the board's duty to determine whether annexation to the Bradley school districts would be beneficial to the educational welfare of any pupils who might later reside in the area. (*Cf. Burnidge v. County Board of School Trustees* (1960), 25 Ill. App. 2d 503, 511.) The educational welfare should be determined by considering the "whole child" and "community of interest" factors. These factors can be evaluated simply by discerning, from the available evidence, the practical educational and social needs of the future residents. This requires a comparing of the quality and physical proximity of both the schools and the extracurricular facilities and programs offered by the competing school districts, as well as the safety of the children. And, when the competing districts are located in separate communities, a determination must be made as to the natural gravitation of the future residents to one or the other community.

To begin, it must be remembered that, at present, no one lives on the property in question and that the property is within the territory of the village of Bradley. Petitioner, Mr. Lovell (Mr. Lovell is an experienced real estate developer in the area and could be considered an expert on the subject at hand), testified that in his opinion most of the residents would come from Bradley. His opinion was based upon his own informal survey and knowledge as a real estate developer in the area. It should be noted that Mr. Lovell conducted a similar investigation before developing the Quail Hollow subdivision. Mr. Lovell anticipated that most of the residents of Quail Hollow would come from Bradley; and indeed, they did. Mr. Lovell conceded that being in the Bradley districts would increase the value of the land in the proposed development and make the homes more marketable. The board seems to have seized upon this one economic consideration and totally ignored the fact the land would be worth more, in large part, because of the educational benefits which would accrue to the future residents, if the land were within the Bradley school districts. The petitioners requested the annexation to the Bradley districts so that future residents coming from the Bradley districts could keep their children in the Bradley schools and programs and not be forced to place their children in unfamiliar surroundings. Testimony also indicates that the village of Bradley is about 50% Catholic and that it was anticipated there would be a substantial Catholic population in the proposed subdivision, which is in the St. Joseph Church area. The church operates a grade school in the center of Bradley. The Kankakee school bus

would deposit students at this school eight blocks from their destination while the BGS bus would take them within three blocks. Moreover, the Kankakee District No. 111 grade and high schools were almost twice as far as the Bradley schools (the former located between 2.5 and 3.9 miles from the property, and the latter 1.7 miles). Although, in either district, the children would require busing, the care and safety of the younger children would undoubtedly benefit from the shortest practical distance. Also, the village of Bradley operates a park program for children; the BB and BGS districts operate a recreational program at the high school community center, as well as little league and midget football programs; and, a grade school athletic program is operated at a site on North Street approximately three blocks from the proposed subdivision. The programs of the school districts would be available only to their own students and families. There is apparently no similar limitation on the park program. School District No. 111 did not offer evidence of similar programs in the neighborhood. The appellants claim that none of the petitioners' testimony is credible. Yet, in no way did District No. 111 impeach this testimony or even offer its own predictions as to the needs of the future residents. We find the evidence and testimony of the petitioners to be credible and important. The proximity of the Bradley community and the facilities and programs which could be offered by the Bradley school districts lead this court to conclude that, regardless of whether the residents will come from Bradley, the Bradley districts are in the natural community of the future residents. Taken together, this evidence clearly falls within the "whole child" and "community of interest" factors and should have weighed heavily in the board's evaluation of the possible benefits which would arise from the granting of the petition. *Board of Education v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392; *Board of Education v. Regional Board of School Trustees* (1980), 86 Ill. App. 3d 230; *Brunidge v. County Board of School Trustees* (1960), 25 Ill. App. 2d 503.

The finding of the board as to possible financial loss to District No. 111 was cryptic at best. The order does not explain what facts led to this finding. Nevertheless, the transcript of the hearing suggests that the board based its finding on the loss of enrollment in District No. 111 over the past 10 years, the loss of State funds as a result of decreased enrollment, the fact District No. 111 has a lower per student assessed valuation than the Bradley districts and the change in the ratio of black to white students over the past several years. This last factor was also important to the board's fear of segregation.

Several statistics must be analyzed in order to determine the pos-

sible financial loss to District No. 111. These include the number of homes expected in the development, the number of school children in those homes, the market value of the homes, and the assessed value of those homes. The number of homes was estimated to be initially 90 in the first 30 acres and, if the rest of the tract (belonging to Mr. Richard) were developed, eventually 160-210 homes in the entire 77 acres. The values would range between $60,000 and $75,000 per home. The parties stipulated that eventually 300 students would live on the 77 acres. The assessed value of all the future homes was estimated to be $4,252,500 (this amount is obtained by multiplying the market value of all the homes, 210 homes x $75,000 = $15,750,000, by the assessed valuation percentage used in the county of Kankakee, 28%). The present assessed valuation of the property is $24,614. It was also stipulated that the assessed valuation of BB is $114,253,288, of BGS is $47,320,790 and of District No. 111 is $148,849,207. The per pupil assessed valuation of BB is $62,600, of BGS is $34,970 and of District No. 111 $24,000.

The board stressed that the per pupil assessed valuation of District No. 111 ($24,000) was lower than that of the BB and BGS districts. Appellants argue that this court should consider the fact District No. 111 is already taxing at its maximum rate without referendum and can ill afford to lose the assessed valuation the land will generate. If we take the appellant's projected assessed valuation of the land with 210 homes, at $75,000 per home, and divide the total by 300 students, one finds a per student assessed valuation of approximately $14,000 per student. Thus, adding the subdivision and its 300 students to District No. 111 would only further decrease the district's per student valuation. It seems the Bradley districts are in a better position than District No. 111 to absorb this low per student valuation. Furthermore, in terms of percentages of total assessed valuation, the $4,252,500 valuation of the development would be only about 3% of District No. 111's $150,000,000 total tax base. If we consider the testimony that only 90 homes would be initially built, then the percentage drops to about 1.3%. The tax income from the development would range from $51,263 to $149,517 (depending on whether there will be 90 or 210 homes respectively). These amounts, while not loose change, are insignificant in comparison to the whole of District No. 111's funds, and it is unlikely that the loss of these amounts would adversely affect the ability of District No. 111 to function, or meet the statutory standards of recognition. (*Board of Education v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 401 (whether a detaching district will remain financially healthy and able to meet

the statutory standards for recognition is more important than the size of the loss of tax revenues and assessed valuation the district must bear).) The appellants also urge this court to consider the State aid which District No. 111 would receive for each attending student. The State presently reimburses the district $1,460 per pupil. The education cost per student is $1,527. Thus, the total added cost to the district for 300 students would be $19,500. This cost, of course, would be offset by the $51,263 to $149,517 in possible tax revenue from the development. At the same time, this calculation demonstrates the diminishing monetary value of the development to District No. 111.

The board also reviewed and compared the enrollment statistics of the various districts in question. The board found that in the last five years District No. 111 lost approximately 790 students, while the Bradley districts had a net gain of 10 students (the high school gained 145 and the grade schools lost 135). It is suggested that simply having the future students in District No. 111 will benefit the district and, conversely, losing the students will be a detriment. We must look, again, at total numbers. The student population in District No. 111 schools in 1980 was 6,334 (a decrease from 7,124 in 1976). the student population of the BGS district was 1,342 and that of BB high school was 1,796. The possible "loss" of 300 future students to a school district containing over 6,000 students is not seriously detrimental. Furthermore, Mr. Lovell's predictions, that most of the future residents and students will come from Bradley, lead this court to the conclusion that not granting the petition would result in a *real* loss to the smaller Bradley school districts.

In its order, the board also based its decision on the conclusion that District No. 111 would suffer further segregation if the tracts were disconnected. Enrollment data shows that over the past 10 years District No. 111 has experienced a declining white student enrollment and an increasing black student enrollment to the point where, in 1980, there were 3,675 whites and 2,639 blacks. The future projections indicated that by 1985 the white enrollment will have dropped to 2,615 and the black enrollment will have attained 2,936. It is our opinion, based on these statistics, that there was no need for the hearing board to engage in its own desegregation program—an approximately 1-to-1 ratio is not segregation. The superintendent of District No. 111, Dr. Doglio, did make an interesting point concerning the detriment to the future students were they not within the integrated District No. 111. He testified that the Bradley districts had, in 1980, only 30 black students. It was Dr. Doglio's opinion that, if the petition were granted, the future students would be deprived of the

opportunity to be educated in a truly integrated environment, and, in particular, would be denied the opportunity to associate with and better understand members of minority groups. In the case at hand, we do not believe this factor, standing alone, is sufficient to deny the petition. There was no evidence that blacks would be discouraged from buying homes in the proposed development. The neighboring Quail Hollow subdivision has several black families. And, there is no evidence that allowing the petition will foster segregation or affect the racial makeup of District No. 111 schools.

■■ It is the opinion of this court that the petitioners provided evidence that the disconnection would not just serve the personal and financial interests of the petitioners, but also the educational development of the future students of the proposed subdivision. Considering the location of the development within the village of Bradley and its very close proximity to Bradley schools and school programs, it is clear there would be a "community of interest" closely connected with the village of Bradley and that allowing the disconnection would foster the development of the "whole child" and, thus, result in an improvement in the educational picture of the entire area. Moreover, the financial loss to District No. 111 in terms of tax income would be insignificant when compared to its total tax base, and the district would not suffer a real decrease in per student assessed valuation. The detriment alleged by the appellants would neither impair the district's financial health nor its ability to meet the statutory standards for recognition. Thus, we conclude that "the *overall* benefit to the annexing district and the detachment area considered *together* * * * 'clearly outweighs the detriment resulting to the losing district and the surrounding community as a whole.' [*Oakdale*], 12 Ill. 2d 190, 194" (emphasis added) (*Board of Education v. Regional Board of School Trustees* (1982), 89 Ill. 2d 392, 400-01), and find, as did the lower court, that the hearing board's findings of fact were against the manifest weight of the evidence and that the board's application of the relevant law to the facts was erroneous.

The decision of the lower court is affirmed.

Affirmed.

ALLOY and BARRY, JJ., concur.